Trippe, Judge.
1. Objection was made, on the trial below, to the introduction of testimony showing that defendant had killed James Little, on the ground that the indictment charged him with the murder of James Little. On inspection of the indictment, the presiding. Judge held the name to be Little. The defendant was served with a copy before arraignment, in which the name was Little. The bill of indictment was read to him on arraignment, charging him with the murder of James Little, and in all the proceedings had, and in the entries on the minutes, that was the name used. Granting that a question might have been raised, whether the name was plainly Little, or that, in some places where it was used in the indictment, it looked as if it could be read Lutle, and if any one will write the two names, it will be seen that, by making the first “t” in “Little” somewhat short, or the dash in crossing these two letters in that name not of full length, how easily it may be made to have that appearance; yet, if this be so, what *61 damage could possibly have resulted to defendant on that account? It was urged in the argument that “a verdict would be no protection to the defendant, nor could it be pleaded in bar of another prosecution against him for the murder of Little without *alwnde proof,” etc. Is this so? If the whole record of the case were introduced or used, showing the verdict, the judgment, and other proceedings, all possible doubt or question as to the name, which could have arisen, would have been settled by the record itself, and it would have sustained the plea of autrefois■ acquit, had it ever become necessary for that purpose. The defendant did not raise the question of surprise, nor could he have done so successfully, for the copy bill and the arraignment used the name of “Little,” and the plea of the defendant was accordingly entered.
2. The same reasons constitute a sufficient ground for sustaining the Court below in overruling the motion in arrest of judgment. The Judge had already, on the motion to reject the evidence, held that the name in the indictment was “Little” and not “Lutle.”
3. The Court was requested to charge the jury, “that if they entertained doubts as to the law, the prisoner is just as much entitled to the benefit of those doubts, as if they applied to the facts. That if they entertained a reasonable doubt as to whether the evidence is applicable to the law as given them in charge, the prisoner is entitled to the benefit of that doubt, and it would be their duty to acquit.” The Judge did not give this request in charge. The defendant was not entitled to the first clause of this request. It uses the word “doubts,” without any qualification as to their character, whether they be reasonable or imaginary. Moreover, we do not think the rule as to doubts has ever been carried so far as to be made applicable to the law. If this portion of the request means that the jurors are judges of the law and must acquit, if they have doubts as to what the law is, it certainly goes beyond any decision yet made, and is inconsistent with the next clause of the same request. See Cook vs. the State, 11 Georgia, 53, as to whether a Judge is bound to give a defendant the benefit of a doubt about the law. That portion of the request which may have correctly stated the law, though not charged as a part thereof, or in the exact words, was substantially given to the jury in the general charge, wherein they were told *that they were “exclusive judges of the testimony, you take the law from the Court, the testimony from the witnesses, see what it is, and apply one to the other. You judge of them, and they enable you to arrive at the truth,” and were further charged, that “the mind of a juror must be convinced, so that no reasonable doubt remains of defendant’s guilt; that is to say, after you have impartially, carefully and solemnly examined and weighed all the testimony in the case, if your mind is still unsettled, wavering, not at rest, it would be your duty to acquit the defendant, for that is the doubt of the law.” This charge *62 gave the defendant all the benefit he could have claimed under the second branch of that request.
4. It was claimed that the Court erred in the charge as recited in the fourth item in the head-notes to this decision. This charge placed no restriction pn the right of the jury to disbelieve any testimony or any witnesses, which, under the law and the evidence, they had the right to reject as unworthy of credit. It was equivalent to the charge so often given, that a jury is not to be quick to impute perjury to any witness, but to reconcile the whole testimony, one part with the other, if they can, and if they cannot, then to do just what they are directed to do in the latter part of this portion of the charge.
5. We cannot see how the defendant could have been injured by the Court telling the jury, that “if you should make up your verdict at any time before twelve o’clock to-night, let the sheriff notify me and I will come to the Court-house to receive it.” It was said in the argument that the charge having been given on Saturday afternoon, this was calculated to hasten the jury in their consideration of the evidence and cause them to run over it without due consideration and care. But did not the jury know before the Judge said this, that it was Saturday afternoon and that the next day was the Sabbath ? He stated to them that he would meet them, if necessary, at any hour up to twelve that night. That was an assurance that they should have to that time, without any danger of being kept together on the following day, if the verdict was agreed on by that hour; without this, they might *have reasonably concluded that unless a verdict was rendered at an earlier hour, they would have to remain during the Sabbath. Besides, the Judge added “but let not the hour control or influence your decision or deliberations. Ret not that consideration shorten or lighten your deliberations one single instant. Examine the case carefully.” Take the whole of the charge together on this point and what was said, provided no verdict was agreed on by twelve o’clock, as to the jury being cared for on the following day, and it would seem that it was calculated to produce a directly contrary effect to that complained of as being likely to follow: See the case of Hewitt vs. Brummell, decided at the present term.
6. It was further insisted that a new trial should have been granted, because from the evidence the defendant was only guilty of voluntary manslaughter. The main facts of the case are, that a dispute had arisen some two months or more previous to the killing, between defendant and the deceased, about some window sash. A law suit resulted, and defendant succeeded in the case. Out of all this, much bad feeling and a strong grudge grew between the parties, and as shown by the evidence, especially on the part of defendant, very violent threats were made by him against deceased. One witness, Bowen, testified that about a month before the fatal rencounter, defendant, in referring to the difficulty about the sash, said: “If Tittle ever bothered him or sooke to him on the street about it. he would cut his damned heart *63 ■strings out. He drew the knife and asked if that would do it.” This was the knife which was so fatally used, and was a heavy, large knife of the bowie-knife kind of blade, and was a very deadly weapon. It is true, the general character of this witness for veracity was strongly attacked. But there was other evidence of a similiar character. R. M. Anton swore that on Wednesday before the killing on Friday, at DeLay’s paint store, on Whitehall street, defendant said in his and DeLay’s presence, that “he (defendant) did not owe any one anything but Rice DeLay, and would not have owed him but for Jim Little, *damned rascal, and he would fix him yet.” Mr. DeLay was in Texas at the time of the trial and was not sworn. Simon Kennedy, who was introduced by defendant, stated that he had heard Little say, “he was not afraid of Oneil’s damned bowie-knife,” and pulling out a common pocket knife, (witness called it a little knife, the blade about two inches long,) said “that was all he wanted for him,” (Oneil.) JVitness told this to Oneil, •who said, in a low tone, “by God, I don’t want him to be afraid of me.”
On the day of the killing, defendant and two others were standing on the corner of Marietta and Broad streets, in the city of Atlanta. Deceased, walking down the street, stopped, and the ordinary salutations were given, deceased saying, “howdye, Belton,” defendant replying, “howdye.” A few remarks were made, the subject of which is not stated in the evidence. Defendant said to Little, “I gained the sash by law.” This was the first reference that was made, so far as the evidence shows, to the irritating cause of the bad feeling between the parties, the feeling which was the source of the threats which have been referred to. Little, excited by this taunt or fling at him, replied, “if you did, you swore to a lie to get them.” Some of the evidence shows it was probable that Little used the words, “damned lie.” Immediately, Oneil struck him in the face with his fist. Deceased caught defendant’s arm, and the testimony leaves it somewhat in doubt whether he struck Oneil. Some of it makes it quite probable, if not' positive, that he did, or struck at him. Defendant thrust his hand under his coat behind and drew his knife and stabbed deceased, about two inches above the groin, inflicting a wound between five and six inches deep, about two inches wide, having a jagged appearance, as if the knife had been plunged in and drawn out. The knife had the effect to do a considerable more cutting by that means. Dr. Heery, the witness who thus .describes the wound,, further describes how the intestines were cut, and the fatal character of the wound, and stated that the knife might turn itself in drawing out. Deceased fell, and defendant immediately ran down the *street, having put the knife in his bosom. The cry was raised to arr.est him and he ran into a store and put the knife behind some boxes, and was arrested at the door as he came out. Deceased died that night from the wound. These are the main facts in the *64 case. Was the jury authorized, from them,'to find a verdict of guilty of murder against defendant? • ' _
Murder is the unlawful killing of a human being ■*.*_’* with malice aforethought, either express or implied. Manslaughter is the unlawful killing, without malice, either express or implied, and without any mixture of deliberation whatever, which may be voluntary, upon a sudden heat of passion, or involuntary, in the commission of an unlawful act, or a lawful- act, without due caution and circumspection. The Code, section 4259, further says': “In - all cases of voluntary manslaughter, there must be some actual assault upon the person killing, or an attempt by the person killed to commit a serious personal injury on the person killing, or other equivalent circumstances to justify the excitement, and to exclude all idea of deliberation or malice† either express or implied. Provocation by words, threats, mem aces or contemptuous gestures shall, in no case, be sufficient to free the person killing from the guilt and crime of murder. The killing must be the result of that sudden violent impulse of passion supposed to be irresistible,” etc.
Take, then, the case as it was presented to the jury. There was the grudge existing between the parties, the defendant’s threats, his quickness to allude tauntingly to the cause of the bad feeling, the instant reply, by a blow, to the words drawn from the deceased by that allusion, the almost instant use of a very deadly weapon, (the weapon with which he had threatened to kill, in a savage manner,) "the terribly fatal manner in which he did use it, his immediate retreat after the fatal stab, and concealing the weapon, and the fact that deceased showed no weapon; and can it be said that the killing was done under circumstances that excluded “all idea of deliberation or malice, either express or implied?” The jury found that it did not; the Court trying the case refused to intervene *against their finding. We feel that the proper enforcement of the law and the safety of human life, and its protection against a too ready disposition, fearfully prevalent, to murderously strike, cut or shoot on the first or least provocation, forbid our interference.
The jury had the right to believe, and doubtless did so believe, that the defendant had determined to kill deceased whenever the -subject that caused the ill blood was raised or discussed between them. If so, that, beyond doubt, made it a case, of murder.
Judgment affirmed.